[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this matter are not in dispute. The plaintiff, whose maiden name was Mary Jane Marquis, and the defendant, were married in Ridgefield, Connecticut, on October 31, 1987. The plaintiff has resided continuously in the state of Connecticut for at least twelve (12) months next before the date of the filing of the complaint. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There is one minor child issue of the marriage, Colby Sumner Collier, born December 5, 1993. No other minor children have been born to the plaintiff wife since the date of marriage of the parties. Neither of the parties has received assistance from the state of Connecticut. The court finds the following additional facts. The plaintiff is thirty-five (35) years old. She graduated in 1982 from the University of Bridgeport with a nursing degree, and graduated in 1986 from the University of Bridgeport School of Law. She is licensed by the State of Connecticut as a registered nurse. She passed the Connecticut Bar approximately seven years ago and was licensed to practice law by the State of Connecticut in 1987. When the parties' married, the plaintiff owned the same 1986 Toyota that she now owns, and had approximately $5,000 in savings. The plaintiff's financial affidavit, dated December 16, 1994, showed credit card balances totalling $13,956.97. Her financial affidavit, dated April 17, 1995, shows credit card balances totalling $20,990.40. As of the closing date of the family residence on June 9, 1995, her credit card balances had increased by approximately $4,000 to $5,000. Her current financial affidavit, dated September 26, 1995, shows a credit card balance of $13,469. Twenty-one thousand ($21,000) dollars was paid on her credit card debt from the proceeds of the June, 1995 closing. The plaintiff paid $3,917.79 towards her credit card debts.
The plaintiff has also charged items on the defendant's credit cards. In December, 1994, she charged $2,095 on his Mastercard. She also charged an additional $511.11 on his credit cards, together with an additional $352.55 between February and CT Page 14288 March of 1995. In February, 1995, she also charged $290.95 on his credit card. There were no pendente lite orders in effect when she made the charges on the defendant's credit cards. The defendant did not authorize all of the purchases made by the plaintiff on his credit cards but he did authorize some of them.
The parties are in dispute as to the cause of the breakdown of the marriage. From the evidence presented, the court finds that the defendant's conduct was the sole cause of the breakdown of the marriage.
The plaintiff owns a 1986 Toyota that she owned from prior to the time she married the defendant. The plaintiff's financial affidavit shows a loan from her parents with a balance of $2,500. The money was used to purchase the Toyota that she owned prior to the marriage. The original loan was in 1986 and had a $2,000 balance at the time of marriage. It now has accumulated interest for a total due of $2,500.
The plaintiff was employed in 1987 for approximately four months as a nurse in a hospital. The plaintiff worked after she graduated law school. During the calendar year 1988, she earned $24,800. During the calendar year 1989, when she worked part of the year, she earned $16,662. The plaintiff also worked for the defendant in approximately 1992. No credible evidence was presented as to what earnings she received for that employment with the defendant. She is unable to obtain a nursing job at the present time because her nursing knowledge is outdated and she would have to update that knowledge. During the period of time that the plaintiff was employed, between 1988 and 1989, she would leave home early and return home between 8 to 9 p.m., while employed in Seymour, Connecticut. The defendant felt that her hours were too long and wanted her to remain at home. The parties decided that it would be best for the marriage if the plaintiff did not continue working, and she therefore terminated her employment. The plaintiff last worked full-time in approximately August of 1989.
The parties filed joint income tax returns for the calendar years 1988 through 1993. Those joint tax returns show the following:
Calender Year Defendant's Schedule C Income
1988 $114,806 CT Page 14289
1989 $155,494
1990 $171,676
1991 $136,793
1992 $ 97,055
1993 $131,908
The defendant presented to the plaintiff a proposed joint income tax return for the calendar year 1994, showing Schedule C income of $80,935. The defendant was not willing to sign that return. The parties closed on the family home on June 8, 1995 and netted $43,783.36 from the sale. On April 24, 1995, a pendente lite order was entered authorizing the payment from the funds held in escrow of $21,000 to be used toward reducing the plaintiff's credit card liabilities. The amount presently being held in escrow from the sale of the family home is $22,783.36 plus interest. The defendant owned the land on the family home at the time the parties were married. It was deeded to him by his mother. The fair market value of the land at the time of transfer was $84,000. The family home was financed through a construction mortgage that was entered into prior to the marriage. The defendant made the payments on the construction mortgage. The plaintiff used her earnings primarily to pay her own personal expenses. The family home was finished in December of 1987. A first mortgage was then taken out on the family home with the funds used to pay off the construction mortgage. All of the payments that were made on the first mortgage came from the -defendant's earnings. The construction mortgage on the family home was in the amount of $190,000. At the time the parties' married, the construction of the home was approximately 90 percent complete. The parties originally had an equity line of credit with The Milford Bank. That was rolled into a New Haven Savings Bank equity line. The defendant borrowed money from the equity line of credit to pay for income taxes. In 1989 or 1990, a three car garage was added to the family home at a cost of approximately $40,000. Some of the cost was paid by income earned by the defendant and part of it was paid from the equity line of credit. Further improvements to the family home consisted of a dog fence at a cost of approximately $3,000, the paving of the driveway at a cost of approximately $8,000, landscaping at a cost of approximately $4,000, and an addition to the house with a CT Page 14290 total cost of materials of $41,775. The defendant presently resides with his parents and does not pay any rent. The $186 rent shown on his financial affidavit is an estimated amount in the event he were to rent his own premises. The defendant's financial affidavit shows gross weekly income of $1,684. He calculated that based on the prior thirteen week period of gross income less gross expenses.
The defendant's financial affidavit, dated September 26, 1995, was based on his gross income for the prior thirteen week period. His income is not steady but does even out on a yearly basis. The defendant's gross 1995 income is estimated by him to be approximately $150,000, less business expenses that he estimates at $50,000 for $100,000 taxable income. As of October 5, 1995 the defendant received approximately $5,000 in office cash payments that were not deposited into his account. In November of 1989, the defendant invested $5,000 into a corporation having to do with swimming pools called Endless Pools. The $5,000 came from the Milford equity line of credit. That investment is not shown on his financial affidavit. Plaintiff's Exhibit 79 are the business records of the defendant for the period of January 1, 1995 to September 24, 1995. During the twelve week period of July 1, 1995 to September 24, 1995, the defendant withdrew $20,602 from that account that were non-business expenses. In addition, money was withdrawn from the trustee account and not deposited into the general account. The defendant's financial affidavit does not show office equipment and his law library. That equipment, including computers, desk and typewriter, as well as the law library, has a gross fair market value of approximately $7,000, and the defendant owes $2,000 for the desk. The $2,000 is shown on his financial affidavit. The net fair market value of the library and office equipment is approximately $5,000. He also owns a coin collection with a fair market value of $200. The defendant has also had approximately $1,500 in additional income during the calendar year 1995 as a result of barter credit. The parties are in dispute as to what the defendant's current income is. The court finds some evidence that his current income for the calendar year 1995, up to the last date of trial, is based on an annualized net income of $100,000. In determining support, alimony and other financial orders, the court is using the $100,000 annual income less deductions for federal and state taxes. The court has taken judicial notice of the tax tables to determine what those deductions should be. The defendant's financial affidavit shows rent in the amount of $186 weekly. At the present time, he is CT Page 14291 not paying any rent and that is an estimate of his future rent. His financial affidavit also shows a Toyota pickup truck with a value of $2,500. From the evidence presented, the court finds that the fair market value of that vehicle is $8,175. His financial affidavit shows a student loan with a balance of $15,000. The court finds that as of September 26, 1995, the student loan balance was approximately $12,000 not $15,000. The defendant presently has a life insurance policy in the face amount of $750,000.
When the parties married, the defendant was in law school and was also working full-time. Defendant received his undergraduate degree in 1980 from Rutgers University, and his law degree in 1983 from the University of Connecticut Law School. He also attended the University of Bridgeport in 1983 where he received thirty credits towards his master's degree. The defendant was employed by Attorney Costantini in December, 1984 as an associate. The defendant became a sole practitioner in July of 1994. Prior to July of 1994, he was in a partnership with the law firm of Costantini and Collier. His working hours consisted of arriving at work at approximately 9:00 a.m. and leaving work between 6:30 and 7:00 p.m. He had an approximate forty-five minute drive each way from home to work and from work back to home. He never worked on Saturday or Sunday. His initial salary was $160 per week gross, together with a percentage of the business he generated. During the ten years that he was with Attorney Costantini, he took very little vacation time.
Pendente lite orders regarding visitation were entered on September 6, 1995. The defendant did not exercise visitation at all times when he was allowed to do so under that pendente lite order. Both parties successfully completed the parent education program. The plaintiff has been flexible regarding visitation and has allowed the defendant to visit at times other than in accordance with the pendente lite order. The plaintiff seeks to have continued an existing restraining order that was entered on August 23, 1995 under the provision of § 46b-15. The court finds that the plaintiff has failed to prove that she is subject to a continuous threat of present physical pain or physical injury, and therefore denies her request to continue the restraining order. The parties are in dispute as to whether they had an agreement for joint custody with primary residence with the plaintiff. The court finds that the parties did not have an agreement for joint custody. The court further finds that there was no motion for reconciliation made in this case. The court CT Page 14292 finds that it is in the best interest of the minor child, that an order of joint custody not enter in this case. The parties, by stipulation, agreed that whatever decision is rendered regarding custody and visitation in this case, that this decision would modify the existing restraining order in accordance with the decision rendered.
A pendente lite order was entered on December 19, 1994, coded 112, by agreement of the parties, for the defendant to pay the plaintiff $200 weekly for groceries and miscellaneous and to pay the household debts and obligations as set forth in a financial affidavit dated December 19, 1994. That pendente lite order was modified as a result of a stipulation between the parties, dated April 24, 1995, coded number 122. In addition to other provisions, that stipulation, coded number 122, increased the weekly payment from the defendant to the plaintiff from $200 a week to $400 per week commencing the week of the sale of the family residence. The following is a list of arrearages arising out of the two pendente lite orders, coded Nos. 112 and 122 through October 13, 1995:
Milford Bank Late Charges: 778.22 (First Mortgage) Interest: 3,870.73 Principal due for April, May June @ 211.22/month: 633.66
5,282.61
New Haven Savings Late charges: 253.75 (Second Mortgage) Interest: 3,270.27
3,524.02
TOTAL 8,806.63
These funds should have been available to hold in escrow as additional proceeds from sale of the family home.
DELINQUENT AND UNPAID HOUSEHOLD EXPENSES AND CREDIT CARD PAYMENTSAND LATE FEES (DECEMBER 19, 1994-SEPTEMBER 30, 1995=41WEEKS)-DEFENDANT'S RESPONSIBILITY
Wife credit cards $142/week $5,822.00 Late charges 254.00 CT Page 14293 6,076.00
Dog's Food 4,533.92 Veterinarian 401.00
Marcus Dairy 64.00
Wife car phone activation fee 45.00
Security system 75.00
CALS 60.10
Appleby-Martin-Cardwell, P.C. 70.00
Comcast Cable 78.81
Shell Oil 50.00
Child Development 47.70
Family Medical Associates 734.50
TOTAL $12,236.03
PAYMENTS MADE BY PLAINTIFF ON CREDIT CARD DEBT
2/95 Optima 25.00 Chemical Bank 50.00 MBNA Mastercard 22.00 Optima 50.00 Visa Travelers Bank 55.00 Life Insurance 12.16 M/C Travelers Bank 75.00 Chemical Bank 50.00 Bank of N.Y. 83.00
3/95 Visa Travelers Bank 55.00 Bank of America 100.00 Visa Travelers Bank 55.00 M/C Travelers Bank 50.00 Optima 30.00 Chemical Bank 49.00 Bank of America 97.00 Spiegel 20.00 CT Page 14294
4/95 Bank of N.Y. 72.00 Visa-Travelers Bank 55.00 Optima 36.00 Spiegel 20.00
6/95 MBNA America M/C 120.00 MBNA America Visa 150.00 Bank of America 120.00 Chemical Bank 95.00 Bank of N.Y. 382.49 Optima 50.00 M/C Travelers Bank 70.00 Visa Travelers Bank 110.00 Spiegel 40.00 Ace Tire Co. 42.40 MBNA America M/C 100.00 MBNA America Visa 100.00
7/95 Travelers Bank Visa 20.00 Optima 25.00 Travelers Bank M/C 20.00 MBNA America 61.17 MBNA America 97.57 Chemical Bank 17.00 MBNA America Visa 10.00
8/95 Bank of America 400.00 MBNA America M/C 131.00 Travelers Bank M/C 20.00 MBNA America Visa 75.00 Chemical Bank 30.00
9/95 MBNA America M/C 105.00 Travelers Bank Visa 20.00 Optima 25.00 Bank of America 400.00 Travelers Bank M/C 20.00
TOTAL $3,917.79
SUMMARY
TOTAL MORTGAGE FINANCE CHARGES AND LATE CHARGES: $8,806.63 CT Page 14295
TOTAL DELINQUENT AND UNPAID HOUSEHOLD
EXPENSES AND CREDIT PAYMENTS AND LATE FEES: $12,236.03
TOTAL PAYMENTS MADE BY PLAINTIFF ON CREDIT CARD DEBTS: $ 3,917.79
TOTAL DUE $24,960.45
The family home was sold on June 8, 1995. The net amount received at the time of closing was $43,783.36. That amount would have been increased by $8,806.63 to $52,589.99, if the defendant had been current in making the payments on the first and second mortgages. As of the date of closing, the parties owe the I.R.S. on the 1993 joint income tax return $37,600.95, which was paid from the proceeds of the closing. The parties are in dispute as to the responsibility for the payment of that tax. By letter dated April 11, 1994, the defendant wrote to the plaintiff as follows:
 At the request of your attorney, I am providing you with this correspondence. With respect to our 1993 federal and state tax returns, each has been prepared at my direction and with information provided to me. I agree to hold you harmless and indemnify you with respect to any tax or penalties due in connection with that return. I also agree to be solely responsible for the preparation fees for those returns.
The defendant now claims that the payment to the I.R.S. was to be made from the joint funds from the proceeds of the real estate closing. The court is not persuaded by that claim and finds he is solely responsible for the payment of those taxes. The arrearage owed by the defendant to the plaintiff, as of October 13, 1995,
1. Amount presently held in escrow from proceeds of sale $22,783.36 (plus interest). That amount would be increased by $8,806.63 if the defendant had been current in his payments on the first and second mortgage to a total of $31,589.99. That amount would have further been increased by the I.R.S. payment of $37,600.95 to $69,190.94 that would have been available at the time of the closing if the defendant had paid the I.R.S. as well CT Page 14296 as keeping the first and second mortgages current. The court would normally have divided that $69,190.94 equally between the parties thereby resulting in the plaintiff receiving $34,595.47. The amount presently held in escrow, which the court orders transferred in full to the plaintiff, is $22,783.36 (plus interest). In crediting the amount that the plaintiff should have received of $34,595.47, by the escrow amount of $22,783.36, that leaves an arrearage due to the plaintiff of $11,812.11. In addition to that arrearage, the defendant owed to the plaintiff, as of October 13, 1995, an arrearage for unpaid household expenses and credit card payments and late fees of $12,236.03. The total of the $11,812.11 plus $12,236.03 is $24,048.14, which the court finds is the amount of the arrearage owed by the defendant to the plaintiff as of October 13, 1995.
The parties reached an agreement regarding personal property and furniture as shown on court's Exhibit 1. That agreement is approved by the court. The court's Exhibit 1 shows the personal property agreement as further articulated on the record by the parties.
The parties are in dispute as to a purported loan from Robert Maquat to them. The defendant claims that Robert Maquat loaned the plaintiff and the defendant $38,000 in 1991, and that those funds were used in the construction of an addition to the family home. The plaintiff denies ever having had any financial transactions with Robert Maquat. The court finds that the defendant has failed to prove by a fair preponderance of the evidence that the funds from Robert Maquat were used toward the addition to the family home, and has further failed to prove that the plaintiff agreed to repay any claimed loan from Robert Maquat. The defendant drafted the complaint for the suit by Maquat against his wife and himself and also paid the pre-judgment remedy entry fee of $50.
The court has considered the provision of § 46b-82
regarding the issues of alimony, and has considered the provisions of § 46b-81 (c) regarding the issues of property division, and has considered the provisions of § 46b-56 and § 46b-56a regarding the issue of custody and visitation, and has considered the provisions of § 46b-84 and the Child Support Guidelines regarding the issue of support, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders: CT Page 14297
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF CUSTODY AND VISITATION
1. Custody of the minor child is awarded to the plaintiff.
2. The defendant shall have visitation every Saturday from 11 a.m. to 3 p.m. He shall also have visitation from 11 a.m. to 3 p.m. on the following holidays: (a) Christmas Day; (b) Father's Day; (c) father's birthday; (d) July 4th; (e) Labor day; (f) Memorial Day; (g) Thanksgiving Day.
C. BY WAY OF SUPPORT
1. The court orders that the defendant pay to the plaintiff, by way of support, the sum of $242 weekly, which is in accordance with the support guidelines.
2. The court orders that the defendant maintain health insurance for the benefit of the minor child and that the parties divide equally any unreimbursed or uncovered house expenses for the minor child.
3. The defendant shall have the right to take the minor child as an exemption for federal and state income tax purposes for each calendar year that he is current in his support payments at the end of such calendar year.
D. BY WAY OF ALIMONY
1. The defendant is ordered to pay to the plaintiff, as alimony, the sum of $400 per week. Alimony is to terminate on the earliest of the following events: (a) the death of the plaintiff; (b) the death of the defendant; (c) the remarriage of the plaintiff; (d) September 1, 1999. The weekly alimony is nonmodifiable as to term. The provisions of § 46b-86 (a) and § 46b-86 (b) are applicable. The court further orders the defendant to pay to the plaintiff, on September 1, 1999, the sum of $50,000. This lump sum payment is nonmodifiable as to term or amount. Her need for alimony will not exist upon receipt of that payment. In the event that the payment is not made, then the weekly alimony payments will continue until such time as the lump CT Page 14298 sum payment is made without the defendant receiving credit for the additional weekly payments.
2. The defendant is ordered to maintain life insurance in the face amount of $500,000, naming the plaintiff as beneficiary for so long as there is an outstanding alimony or support order. Commencing one year from the date this decision is filed, and annually thereafter, he is to provide the plaintiff with written proof that such policy is in full force and effect. Commencing one year from this date, the face amount of such policy may be reduced by $30,000.
3. The court orders that the arrearage, which is in the nature of alimony found in the amount of $24,048.14, be paid as follows: (a) first payment is due on February 1, 1996 and is in the amount of $548.14. Thereafter, monthly payments commencing on March 1, 1996, and on the first day of each month thereafter, are to be made in the amount of $500. Interest on the unpaid balance is to run at the rate of 10 percent per annum commencing February 1, 1996. Payments are first to be applied towards interest, with the remaining portion of the payments to be applied towards principal.
4. The defendant is to provide health insurance to the plaintiff under COBRA for the maximum period allowed by law at the sole expense of the plaintiff.
E. BY WAY OF PROPERTY ORDERS
1. All of the liabilities shown on the defendant's financial affidavit shall be paid by the defendant, and he is to hold the plaintiff harmless therefrom.
2. All of the liabilities shown on the plaintiff's financial affidavit shall be paid by the plaintiff and she is to hold the defendant harmless therefrom.
3. The 1996 Toyota Corolla, shown on the plaintiff's financial affidavit, is awarded to the plaintiff.
4. All of the equipment, furniture and fixtures that are part of the defendant's law practice, as well as his law practice, are awarded the defendant.
5. The coin collection owned by the defendant is awarded to CT Page 14299 the defendant
6. The agreement reached between the parties regarding the division of personal property and furniture, shown as the court's Exhibit 1, is approved by the court, and orders are entered in accordance with that agreement.
7. The defendant is to indemnify and hold the plaintiff harmless from any claim of Robert Maquat involving any alleged loans by Robert Maquat to the defendant and/or the defendant and the plaintiff.
F. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either party.
G. MISCELLANEOUS ORDERS
1. The order for relief from abuse that was entered on August 23, 1995 under the provision of § 46b-15 is vacated.
2. The parties are ordered to exchange copies of their federal and state income tax return within thirty (30) days after such returns have been filed by certified mail, return receipt, or registered mail, return receipt, for so long as there is an outstanding support order or alimony order. In addition, the defendant is to provide to the plaintiff with a copy of all tax returns filed regarding his law practice within thirty (30) days after such returns have been filed by certified mail, return receipt, or registered mail, return receipt, for so long as there is an outstanding support order and/or alimony order.
3. Counsel for the plaintiff is to prepare the judgment file within thirty (30) days and send it to counsel for the defendant for signature and filing.
Axelrod, J. CT Page 14300